UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No: 19-10146-IT |
| ) | |
| SYRUS HAMPTON ) | |

**DEFENDANT SYRUS HAMPTON'S SENTENCING MEMORANDUM**

Syrus Hampton stands before the court having pled guilty to a one count superseding indictment charging Felon in Possession of Ammunition in violation of 18 U.S.C. § 922(g)(1). Mr. Hampton asks that the Court impose a sentence of time served, with supervised release of three years to follow.[1] We make this recommendation to the Court because of the tremendous progress Mr. Hampton has made in his life since his release on pre-trial conditions, and the correlating low risk of reoffending. Simply stated, Mr. Hampton's extraordinary efforts set him apart from other individuals charged with a similar offense. He is a different man than he was when he committed this offense. His metamorphosis from that day to this one is nothing short of remarkable, and places him in a unique category of defendant – one that does not require further incarceration to accomplish the goals of sentencing.

This sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

Since his release in June of 2019, Mr. Hampton has demonstrated extraordinary personal

---

[1] Mr. Hampton was held in custody on this case from Jan. 25 - June 5, 2019, approximately 131 days. PSR p. 2.

1

growth. He has completed both RISE and the Restorative Justice Program. RISE has taught him both practical life skills and emotional coping skills and has helped him move past some of the trauma and negative thinking he carried for so many years. The Restorative Justice program has given him an awareness and understanding of the danger and the ripple effect that guns cause in the community, and of the work he needs to do to make amends for his actions. He sat down face to face with victims and survivors of gun violence. He heard their stories, heard their pain, and the grace they extended to him in those meetings allowed him to grow as a person. What he learned through the Restorative Justice process has done more to prevent any future crime than any prison sentence possibly could.

He has done all of this despite hardships that would have thrown many people off track. Mr. Hampton has been singularly focused on improving his life despite the uncertainty of his future. We hope the Court can see the degree to which he has invested in himself and reach the same conclusion that we do – that no further incarceration is necessary in this case to serve the purposes of sentencing.

**I.   The Sentencing Guidelines**:

The Probation Department has calculated the guideline range to be 70-87 months. PSR p. 20. We have no objection to this calculation. We request that the Court vary downward considering the sentencing factors set forth below.

While the Court is required to compute the Guideline Sentencing Range as a "starting point and the initial benchmark," the Guidelines are not the sole, nor even the first among the factors that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment

based on the facts presented." *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). Indeed, "the Guidelines are only one of the factors to consider when imposing a sentence and 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Id.* at 59.

II.     **The Nature of the Offense**

Mr. Hampton does not seek to characterize, dispute or otherwise justify the facts of this case.[2] We rely upon the relevant portions of the offense conduct as articulated in the Pre-Sentencing Investigation Report, pages 4 – 6, and as adduced at the suppression hearing in this case, conducted on January 24 and February 13, 2020.

III.    **History and Characteristics of Syrus Hampton**:

To measure Mr. Hampton's progress, one must understand where he began. Mr. Hampton's mother was a drug addict. He never met his father. Mr. Hampton's childhood was turbulent. He was emotionally abused, and he witnessed his mother's boyfriend beating her. He suffered from chronic neglect and poverty. His mother sometimes disappeared for days at a time, leaving him to care for his younger siblings. He sought refuge and shelter when and where he could: with his sister, who was ten years older, with his grandmother, and with friends.

Mr. Hampton enjoyed school, although he was often absent or tardy due to his chaotic family life. He warmly remembers the care that teachers and others showed to him. For example, he recalls that his middle school principal cut his hair and bought him a suit for his graduation. Yet even that memory also carries pain: when Syrus proudly showed off his new look to his sister, his mother berated him.

At Madison Park High School, Syrus took carpentry classes, found work opportunities,

---

[2] Mr. Hampton's only objection to the Offense Conduct is to assert that he is not, nor has he ever been, a gang member.

and played football and basketball. His football coach and teacher, Roosevelt Robinson, describes Syrus as a well-liked, respectful kid who had "too much working against him." Mr. Robinson recalls that Syrus frequently came to school unkempt, didn't have enough to eat, and often avoided going home, staying on the streets or on a friend's couch.   Syrus struggled academically - earning only six credits in his three years of high school - and was on an individualized education plan. Mr. Robinson reports that Syrus received little support at school; the specialists assigned to help him were either overwhelmed or apathetic.   Mr. Robinson, who also is a cabinet maker, took Syrus on some jobs with him, but found that Syrus struggled to take accurate measurements because he lacked basic math skills. Mr. Robinson also remembered that Syrus' reading and writing ability was so poor that he had difficulty filling out job applications.

      Despite the challenges Syrus faced, he seemed to have some hope for his future. That hope was nearly extinguished after he was shot at a party when he was barely 18 years old. The shooting traumatized him and led him to leave school. He had just become a father for the first time. He moved in with his girlfriend's family and resisted Coach Robinson's efforts to have him enroll in Job Corps because it would require him to leave Boston. He now regrets that decision.

      To nearly lose one's life while merely attending a party profoundly changes a young man. For Syrus Hampton, being shot was a turning point in his life. His community never truly felt safe again after that moment. He began to view life as temporary, fleeting, extinguishable at any moment. Any person, known or unknown to him, could be the one to end his life. It may seem incongruous, then, that Mr. Hampton himself now faces a charge of possession of ammunition by a convicted felon.[3] However, this behavior is consistent with research findings

---

3  The ammunition was found in a loaded firearm. Because the gun appeared to be assembled from a kit and therefore investigators could not show whether it crossed state lines, Mr. Hampton was not charged with possession

such as a study conducted by the Urban Institute's Justice Policy Center in 2018, which surveyed young adults in Chicago's West and South sides, areas with consistently high gun violence. Rather than for reasons like perpetuating gang violence, the drug trade, or status, safety concerns - both for themselves and for their family members and friends - were among the top reasons cited for gun carrying among male respondents. Nearly all the men who self-reported having carried said they did so to protect themselves (93 percent), while relatively few reported carrying to commit crimes (6 percent) or for status (6 percent). *See,* Fontaine, Jocelyn; La Vigne, Nancy; Leitson, David; Erondu, Nkechi; Okeke, Cameron and Dwivedi, Anamika, "*We Carry Guns to Stay Safe: Perspectives on Gun Violence from Young Adults Living in Chicago's West and South Sides*," Urban Institute Justice Policy Center, Oct. 2018, *attached as* Ex. B. While clearly dangerous, misguided, and illegal, the choice to illegally possess firearms or ammunition is mainly fear-based, and a response to a legitimate threat of violence. And further consistent with Mr. Hampton's experience of being shot, the same study indicated that "of those who carry guns, more than one-third (37 percent) reported having recently been shot or shot at. Further, the overwhelming majority of them know someone who has been shot or shot at. An analysis predicting the likelihood of gun carrying among the male respondents showed that men who had been shot or shot at in the past year were 300 percent more likely to report that they had carried a gun than those who had not been shot or shot at recently." *Id*.

      Magistrate-Judge Donald J. Cabell released Mr. Hampton from custody on June 5, 2019. His original conditions requiring him to remain at his residence 24 hours a day were modified: first, to allow him to help care for his newborn child; then to allow him to spend time with his

---

of the gun itself.

other children;[4] and again to permit him to work in Wellesley.

In May 2021, he began the RISE program. This is where Mr. Hampton truly began the work of breaking the cycle of urban firearm crime.

Since his release, Mr. Hampton has lived in the basement of the home of Britannia "Brit" Johnson, a TV producer, real estate agent, and business owner. Ms. Johnson, who is about ten years older than Mr. Hampton, became a close family friend after she started going to school with Mr. Hampton's older sister in first grade. Mr. Hampton refers to Ms. Johnson as his sister. She has provided him with job training by having him assist her in her television production, real estate business, and car-sharing business. She describes him as diligent in carrying out those assignments. Until Mr. Hampton recently started a job, he regularly was providing childcare for his youngest children during the day while their mother worked.

In an interview, Ms. Johnson recalled Mr. Hampton's chaotic childhood. Mr. Hampton and his younger siblings often sought refuge with her after she got her own apartment.  She reports that Mr. Hampton seemed to relish being in a more structured and quieter environment. He followed Ms. Johnson's strict rules, which prohibited swearing and required the children to read. She believes that Mr. Hampton has thrived since his release, living in a more peaceful environment, away from the street life he had known. She describes the way he engages with and cares for his children, demonstrating innate parenting skills that he had not experienced as a child.  Ms. Johnson is convinced that Mr. Hampton wants to make a positive change in his life and has taken steps toward doing so. *See*, *Letter from Britannia Johnson*, Ex. A.

---

[4] Mr. Hampton has four biological children. In addition, the mother of his two youngest children also has a 10-year-old whose father died when she was an infant. Mr. Hampton is the only father she has ever known, although he is not related to her biologically.

Mr. Hampton has never been convicted of a crime of violence, although he has been found guilty of drug crimes and gun possession. The police have classified Mr. Hampton as a member of the Crown Path gang, but the data upon which this is based is at least ten years old and, at most, reflect that he was arrested twice with alleged gang members (one of whom was not even labelled as a member of that gang) and once seen with an individual with whom he had also been arrested for trespassing and was also labeled a Crown Path member. Mr. Hampton denies ever engaging in gang activity. At most, he says, he hung out with other youths in his neighborhood.

### IV. Achievements During Pre-Trial Release – Application of § 3553(a)(2): This case presents the Court with rare circumstances

At a hearing in this case in February 2021, this Court told Mr. Hampton that pretrial release was his opportunity to use the time to make sure his life was in a good place, and to make sure he was moving forward. Mr. Hampton listened to the Court that day, and he took those words to heart. With the help of the U. S. Probation and Pretrial Services Department, he has used the opportunity afforded to him to take on tremendous new challenges, to learn new skills, to further his education, to build a professional resume after years of unemployment, and to repair and cultivate relationships with his family and community. He stands before the Court today as a person transformed by his experiences in the RISE and Restorative Justice programs.

#### a. *Employment*

Mr. Hampton was mostly unemployed from 2010 until February 2021. Then, in February 2021, he began working nights as a guest services associate at Mobil gas stations in Waltham and Westwood. He made $15 dollars an hour and while the work was not glamorous, he was making money to help support his children for the first time in years.

Then, in December 2021, he had the opportunity to work at the job he holds today at the Boston Neighborhood Network. BNN is a media company run by "Brit" Johnson, who remains one of Mr. Hampton's biggest supporters. Ms. Johnson's work is centered primarily on activism that seeks to empower underserved communities in the Boston area to increase homeownership. BNN hosts events and uses online and local-access television broadcasting to reach a population where homeownership is often an unattainable goal. In this job, Mr. Hampton has learned a variety of skills, like video and sound editing, and developing multimedia presentations for broadcast on local access cable television and the organization's YouTube channel. Mr. Hampton is the group's "jack of all trades," and considers no task too great or too small, from media production to moving furniture.

   b. *Education*

Shortly after he was shot in crossfire at a party at age 18, Mr. Hampton left school. PSR ¶57. He was in his junior year at Madison Park High School when he left, and soon thereafter his first child was born. He lost the stability of the school environment and his mentor relationship with his athletic director. In RISE, he embraced the goal to obtain his G.E.D. This requirement, which he viewed as a gift, forced him back into academic study for the first time in many years. In many ways, he had to start over from the beginning and catch up before he could begin the testing phase. He passed four of the five HiSET classes. He took the final test – a writing component – twice. He was disappointed to learn earlier this month that he again failed this last test, but he is undaunted by the prospect of studying and taking it again. His determination to meet this goal has only strengthened in the wake of this disappointment, and he remains

confident that he – someone who struggled in school with an IEP – will ultimately succeed despite some setbacks.[5]

### c. Financial Literacy

Growing up in poverty, at times extreme poverty, did not provide Mr. Hampton with a model for how to achieve financial stability and independence as an adult. Two of Mr. Hampton's "big picture" goals are (1) owning his one home, and (2) starting his own business. Part of job at BNN includes moving families into their first homes. Their joy in those moments was contagious for Mr. Hampton. The financial literacy class he has completed has given him a clearer picture of how to set a path forward toward these goals. And perhaps as importantly, the class has given him hope for the first time, that he can one day achieve them.

### d. Repairing and/or Strengthening Personal Relationships

One of Mr. Hampton's personal goals in RISE was to find a pathway to healing from some of the trauma of his childhood, where he could arrive at a place of peace in his heart and not carry his pain forward to his children and other loved ones. Through the cognitive behavioral training courses he completed, and the moral reconation therapy classes, Mr. Hampton has redefined his relationships with his mother, his larger family, and his partners.[6]  One of the areas

---

[5] Mr. Hampton's recent HiSET achievements are further laudable given his historical struggle with traditional learning, as recorded in his Individualized Education Plan at Madison Park High School for the 11th grade - his final year in school: "Syrus has a learning disability. His disability affects progress in the following ways: difficulty comprehending grade level content material; Difficulty completing grade level written assignments including spelling and Grammar; difficulty interpreting information; difficulty completing assignments independantly [sic]; difficulty understanding written/oral directions; Difficulty completing assignments independantly [sic]. Syrus will benefit from the following accommodations; preferential seating and a distraction free area to aid concentration & attention: clarification/repetition of instruction to ensure understanding; additional time to complete tests/tasks due to difficulty with written tasks; use of a calculator because of difficulty with fact recall; use of writing webs/graphic organizers to organize and expand ideas."

[6] Developers of Moral Reconation Therapy (MRT) describe the treatment as the following: "MRT is a cognitive-behavioral treatment system that leads to enhanced moral reasoning, better decision making, and more appropriate behavior." At its heart, MRT is a cognitive-behavioral therapy (CBT). It aims to change faulty thought processes

he most enjoyed was the parenting programs. He started with a Fathers Program at My Brother's Keeper 617 in Boston, and then enrolled and completed Emerson College's new "Nurturing Fathers" program, in January – April 2022. At Emerson in particular, Mr. Hampton found the sessions to be tremendously beneficial in helping him define his role as a nurturing father to his kids – something he never had during his own life, and therefore had no model to build from as he tried to navigate parenthood himself.

To properly gauge his success, one need only look to the letters submitted to this Court on Mr. Hampton's behalf from Ms. AnneMarie Wilson, and from Ms. Fabie Elysee. Mr. Hampton has used the skills from his parentings classes to improve and maintain co-parenting relationships with them both.

> He is a hard-working family man who in the past has succumbed to some bad decisions but has immensely improved in his decision making in the past few years. If I was asked to write this letter a few years ago, I would have respectfully declined. I am happy to stand beside him in this moment, and state that he has done a complete 180. He has worked hard to come out on the other side of the circumstances dealt to him and has become a better man because of it.

*Letter of Fabie Elysee*, mother of Syrus, age 14. Ex. A.

> One of the biggest and most important areas of his growth I would say is in parenting [our children]. As he's grown independently as an individual, I see the changes he implements in his parenting and his devotion to give all our children a better future and better upbringing that he had growing up. This is a man that is very devoted and family oriented and would do anything for his family and to create a path of success. Over the past 3 years he has become more understanding and levelheaded. He has been very open with me throughout his term in the program, sharing the knowledge that he's gained and how he plans on implementing it within his life, and has put in the work to make those changes

---

that have led to poor decision-making and substance abuse. Its focus on moral reasoning sets it apart from other CBT-related therapies. Moral reconation therapy is a manualized treatment that occurs primarily in group settings. Clients have a workbook that is used to guide the therapy. Available at: https://www.theraplatform.com/blog/554/moral-reconation-therapy, last accessed 15 September 2022.

happen. Although he's always been a good person, I've noticed his determination to do and be better. He's developed positive morals and values and has taken the knowledge he's gained and applied it daily with the understanding that "it's a marathon not a sprint" but pushes himself to set goals, knock them down and set more.

*Letter of AnneMarie Wilson*, mother of Orion, 1, Ny'Syia, 3, Sy'eir, 4, and Zinni, 12, Ex. A.

**V.     Downward Variance for Pretrial Rehabilitation**

The Supreme Court has expressly found that post-sentencing rehabilitation is an appropriate sentencing factor. "A district court at resentencing may consider evidence of the defendant's post-sentencing rehabilitation and that such evidence may, in appropriate cases, support a downward variance from the now-advisory Federal Sentencing Guidelines range." *Pepper v. United States*, 562 U.S. 476, 481 (2011). In *Pepper*, the Supreme Court determined that the federal sentencing scheme made it necessary to consider evidence of the defendant's post-sentencing rehabilitation for two main reasons. First, to fashion a sentence that is appropriate for an individual, and not just a crime, sentencing judges have traditionally considered the full range of available information. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper* at 488, quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984). Second, evidence of post-sentencing rehabilitation is necessary because it is relevant to many of the sentencing factors under 18 U.S.C. § 3553(a)("The extensive evidence of Pepper's rehabilitation since his initial sentencing is clearly relevant to the selection of an appropriate sentence here. Most fundamentally, that evidence provides the most up-to-date picture of his 'history and characteristics.'"). *Pepper* at 491-492. In short, evidence of post-sentencing rehabilitation "bears directly on the District Court's overarching duty to 'impose

a sentence that is sufficient, but not greater than necessary' to serve the purposes of sentencing.'" *Pepper* at 493, quoting 18 U.S.C. § 3553(a).

The principles in *Pepper* are applicable to Mr. Hampton. He has not been rearrested for any new offense. He has held gainful employment and learned new skills to carry forward in the job market. He has improved his relationships and developed new, prosocial relationships in his community. He has spent more time parenting his children, caring for their daily needs, taking them to and from school, mentoring their extracurricular activities, etc. He has worked hard toward completing his high school education, with goals to study beyond that level. He is goal-oriented, ambitious and optimistic for his future as a contributing member of his community.

We ask this Court to impose the requested sentence of time-served, with a term of supervised release to follow as the Court deems appropriate. This sentence balances the seriousness of Mr. Hampton's offense with the outstanding level of work he has accomplished in the past two years as he has sought to make amends for the harm his actions have caused. No programming within the Bureau of Prisons can match the programming Mr. Hampton has already undertaken and completed, and conditions of supervised release reflecting his ongoing commitment to personal growth will better serve both Mr. Hampton *and his community* here in the Boston area.

### Conclusion

It is all too rare that an arrest leading to a federal criminal indictment proves to be a positive experience for someone. But Mr. Hampton has demonstrated that he is the exception to the rule. His time pending sentencing has proven transformative for his life and the lives of his family.

Based on an overall consideration of the 3553(a) factors, the Court has ample support for a sentence that places greater weight on rehabilitation than on isolation for Mr. Hampton. As the court stated in *United States v. Rodriguez*:

> In the final analysis, then, the gloss supplied by *Kimbrough* signifies that a district court should not evaluate a request for a variant sentence piecemeal, examining each section 3553(a) factor in isolation, **but should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.** This inquiry should be guided by, but not made unflinchingly subservient to, the concerns expressed in the statute's various sub-parts.

*United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis supplied).

Here, when the Court considers all the relevant factors as a group, a sentence that keeps Mr. Hampton in the community is logical, practical, and supported. For this man, at this moment in time, this sentence is just.

SYRUS HAMPTON
By his attorney:

*/s/ Julie-Ann Olson*
JULIE-ANN OLSON
BBO # 661464
Federal Public Defender
51 Sleeper Street, Fifth Floor
Boston, MA 02210
Tel. 617-223-8061

CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by electronic filing notice on September 16, 2022.

*/s/ Julie-Ann Olson*